539 So.2d 1268 (1989)
Ciller R. MILLER, et al., Plaintiffs-Appellees,
v.
Charles R. WHITE, et ux., Defendants-Appellants.
No. 87-1347.
Court of Appeal of Louisiana, Third Circuit.
March 15, 1989.
*1269 C.R. Whitehead, Jr., Natchitoches, in pro per.
Gahagan & Gahagan, Marvin F. Gahagan, Gahagan & Conlay, for Gary L. Conlay, Natchitoches, for defendant/appellant.
Before STOKER, DOUCET and KNOLL, JJ.
STOKER, Judge.
This is a petitory action.[1] Plaintiffs initially filed a possessory action, in which they were successful, after defendants built a fence on what they believed to be their legal boundary line. Defendants subsequently initiated this petitory action, to which plaintiffs filed an exception of prescription. The trial court sustained the exception of prescription, finding that plaintiffs had in fact possessed the property in question in excess of 30 years and were therefore entitled to ownership by acquisitive prescription. Defendants appeal this judgment.

OPINION
Defendants contend the trial court erred in allowing plaintiffs to tack their possession to that of their ancestor in title (Silas Lewis) in order to prove ownership by 30 years acquisitive prescription because plaintiffs' title does not include the disputed strip in its property description, nor does their ancestor's title include it. Defendants also contend that plaintiffs did not carry their burden of proving adverse corporeal, notorious possession.
The trial court based its finding that plaintiffs and their ancestors possessed the disputed strip for 30 years on the following:
"The Court is convinced that Ciller Miller, Drew Miller and J.D. Walker have in fact possessed the property in question in excess of thirty (30) years and they are, therefore, entitled to ownership by acquisitive prescription. The Court accepts the testimony of the witnesses as being logical and truthful, and finds the testimony of Charles R. White and wife, Doris Joseph White, to be rather vague and indefinite. It is, therefore, the ruling of the Court that the exception of acquisitive prescription is maintained and that the petitory action of Charles R. White and his wife, Doris Joseph White, be dismissed at their costs."
Although the trial court's findings are insufficient to support its judgment, we find, after careful examination of the record, that there is sufficient evidence in the record to support a judgment in favor of plaintiffs.
Ownership is lost when acquisitive prescription accrues in favor of an adverse possessor. LSA-C.C. art. 481. In order that ownership may be acquired by acquisitive prescription, possession for the *1270 required amount of time must be shown to have been continuous, uninterrupted, unequivocal and as owner, and the limits of such possession must be established. Fruge v. Lyons, 373 So.2d 220 (La.App. 3d Cir.1979). A possessor must establish not only that there has been corporeal possession of the property for the required period of time, but also that there was a positive intent to take and commence possession of the property as owner. McCoy v. Toms, 384 So.2d 518 (La.App. 2d Cir.), writ denied, 388 So.2d 1161 (La.1980). In order for plaintiffs to apply the principle of "tacking," they must prove that they and the their ancestors exercised possession of the disputed strip up to a visible boundary since the strip is not included in their title. See Fruge v. Lyons, supra, and cases cited therein.
Although the trial court did not make a specific finding of the requisite intent to possess as owner, we can easily discern such intent from the record. Moreover, one is presumed to intend to possess as owner unless he began to possess in the name of and for another. LSA-C.C. art. 3427. There is no evidence in this case that plaintiffs and their ancestor possessed the property for anyone other than themselves. Ciller Miller testified as follows:
"Q. And did you ever live in a house on this property?
A. I lived there for years.
Q. Do you know when you first started living there, please?
A. Not really. It's been so long.
Q. Speak up, please ma'am.
A. It's been a long time.
Q. Well, do you have any idea?
A. About.... about forty-one years.
Q. About forty-one years?
A. Uh-huh.
Q. Well, did you live there with your parents?
A. Uh-huh.
Q. And then you continued to live there?
A. After my parents died I still lived there.
Q. Do you know who put up this fence we're talking about?
A. Silas Lewis.
Q. Your father?
A. Uh-huh.
Q. Do you know when he put it up?
A. Oh, he put it up before he moved to town, he put that fence up.
Q. And he always claimed all of that property that was fenced as his?
A. It was his fence, his property. Everybody knew that what lived around there.
Q. How did he use it?
A. We had a house there and a yard."
* * * * * *
"Q. Do you know who tore the fence down that was there?
A. Charles Raymond tore it down. He tore it down.
Q. Mr. White?
A. Yeah, White. He tore it down. Cause my son come by there and they had put some posts up and he asked him what he was doing. He said he was putting some posts up. He said, well, you're putting that on our property. He said, no, it's my property. And he had already cleaned the line piece."
Rosa Mae Frazier, a neighbor, also testified as to the presence of the fence and plaintiffs' possession of the property:
"Q. And how long have you lived on that property?
A. I moved back there in '41.
Q. In 1941?
A. That's right.
Q. Were you familiar with the fence.... you're familiar with Mr. White's property, Charles White?
A. Well, I been knowing that property ever since I been back there.
Q. Right. But you didn't necessarily know who owned it.
A. Yeah, Silas Lewis.
Q. Okay. Owned the property that Ciller owns?

*1271 A. That's right.
Q. Were you familiar with the location of a fence that separated those properties?
A. Correct.
Q. And when was that fence erected?
A. Well, I wouldn't know exactly what year it was erected but I remember when, you know.... you know, she on one side, the property on one side, and I'm on the other side. Well, you cleaning up property you will.....
Q. Let me ask you this, was the fence there when you moved there in '41?
A. They were living there.
Q. Right. Who was living there?
A. Silas Lewis. The fence was there. Ciller went in with her father."
* * * * * *
"Q. Yes, ma'am. Do you know what happened to that fence?
A. No. All I know I seen them over there cutting and sawing. I didn't know. Thought they just cleaning up."
The testimony of Dorothy Lee Stewart, a former neighbor, also supports plaintiffs' claims:
"Q. Did you ever have occasion to live in a house on the property Mr. White owns at the present time?
A. Right. I moved there in 1959. And I stayed there until 1971. In those apartment houses. We was renting from Mr. Wesley Stephens.
Q. Were you familiar with a fence that separated that property?
A. It was a fence there. Cause we didn't have no.... just like here, that's the fence. And this was our back yard.
Q. In other words the fence was right up against the....
A. Right up against it. We didn't have no back yard back there.
Q. That was the fence that separated that property you were living on....
A. Right.
Q. ... from the Miller property?
A. Right."
* * * * * *
"A. I moved in in 1959. And I stayed there till 1971.
Q. Okay. Do you have any knowledge about the fence prior to that 1959 time when you moved there?
A. No, cause when I moved there it was there. And when I left there it was there."
Testimony from plaintiffs' witnesses, neighbors and family established that plaintiffs' wire fence was maintained at least from 1941. The testimony also indicates that the fence actually existed until defendants removed it in 1986. Although plaintiffs' ancestor, Silas Lewis, did not buy the property until 1943, the testimony of Ciller Miller and Rosa Mae Frazier indicates that Lewis was living on the property, and had fenced it, in 1941 and was apparently regarded as the owner of the property. Plaintiffs' witnesses also testified that the fence existed, although overgrown, until defendants cleared the fence line and removed the fence in preparation for building their own fence in 1986. Defendant, Charles White, testified that when he bought the adjoining lot in 1975 there was no fence, only an overgrown area with trees. However, White also stated that when he commenced to build his new fence in 1986 he found some wire stretched across the trees which he thought was an old clothesline.
We find that plaintiffs have borne their burden of proof to establish 30 years corporeal possession sufficient to entitle them to ownership of the property. Although it is unfortunate that defendants did not realize that the wire was meant to be a fence and were not therefore aware that their vendor no longer owned the property described in their title, this is irrelevant as to the issue of plaintiffs' ownership. We also find that the case of Babin v. Montegut, 271 So.2d 642 (La.App. 1st Cir.1972), is not factually similar to the case before us since in Babin the court found that prescription was interrupted *1272 by ownership of the two adjoining tracts by a common owner. Plaintiffs have therefore established their ownership of the disputed property by 30 years acquisitive prescription.
Defendants also argue that plaintiffs confessed judicially that they are not owners of the disputed strip when they opened Silas and Oreila Lewis's successions and had themselves placed in possession of the lot described in their title. See LSA-C. C. art. 2291. We disagree. Plaintiffs judicially confessed only to owning the lot described in their title. This cannot be construed as an admission to not owning the disputed tract. Since a title is not necessary to tack their possesion onto their ancestors' possession where a visible boundary is maintained for 30 years, the acquisition of the title property by inheritance did not affect plaintiffs' acquisition of the disputed strip by 30 years acquisitive prescription.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to defendants-appellants.
AFFIRMED.
NOTES
[1] The judgment below recognized plaintiffs' right to ownership of the following described immovable property:

Lot 6, Block 10 and the North 16.6 feet of Lot 7, Block 10 of the Jefferson Highway Realty Company addition to East Natchitoches Company, as per plat of East Natchitoches Company recorded at Book 142, page 282 of the Conveyance Records of Natchitoches Parish, Louisiana.